STADIUM MANOR, INC. *vs.* DIVISION OF ADMINISTRATIVE LAW APPEALS[1] & another[2] (and a companion case[3]). January 22, 1987. *Rate Setting Commission. Nursing Home. Estoppel.*

On July 28, 1975, Israel Grossman and Nathan Korff, on behalf of Walmont Realty Trust (trust) and Walmont Nursing Home, Inc. (corporation), entered into a purchase and sale agreement with James D. Regan and Mary A. Regan (husband and wife) for the sale of the shares of the trust and the personal property of the corporation. The corporation operated a nursing home known as Walmont Nursing Home (Walmont) on real estate owned by the trust. The purchase price for all of the assets was $1,200,000. The Regans agreed to pay $10,000 in cash, assume a first mortgage of about $190,000, and give notes for the balance of the purchase price, secured both by second mortgages on the assets to be transferred and certain personal and business real estate. The nursing home would later be operated by Stadium Manor, Inc. (Stadium), a corporation formed for the purpose.

Walmont had provided, and Stadium expected to continue to provide, care for patients eligible for public assistance. Providers of such care are entitled to reasonable reimbursement by the Department of Public Welfare at rates established by the Rate Setting Commission (commission). See G. L. c. 6A, § 32. Significant components in the determination of rates by the commission are the values of a nursing home's fixed assets — land, buildings and equipment.

At the time of the contemplated sale, the commission had established a general policy that a buyer in a "stock" sale of a nursing home acquired the seller's basis for fixed assets for rate making purposes. There is no dispute that the sale here constituted a "stock" sale. There were exceptions

---

[1] Formerly, Division of Hearings Officers. See G. L. c. 7, § 4H, as in effect prior to St. 1983, c. 683.

[2] Rate Setting Commission.

[3] Stadium Manor, Inc. *vs.* Division of Administrative Law Appeals, Rate Setting Commission and Department of Public Welfare.

to the general policy: if, on application, the commission in advance of the sale issued an advisory ruling approving the sale, the buyer would be entitled to the use of a stepped-up basis — the purchase price — for the fixed assets. Recognizing the commission's policy and procedure for exception, the purchase and sale agreement called for, "as a condition precedent to performance by the Buyers," the sellers to obtain an advisory ruling of the commission permitting the buyers to use a stepped-up basis for rate setting purposes.

On July 22, 1975, six days before the execution of the agreement, the sellers applied to the commission for an approving advisory ruling. In support of that request, the parties submitted financial data, a copy of the proposed purchase and sale agreement and other documents which represented that James and Mary Regan were the buyers. In addition, the sellers and the Regans submitted affidavits stating that the sale was at arm's length and that the parties were not related directly or indirectly. The Regans, in a separate affidavit, said that "we have no present intention to re-sell the stock in the Walmont Realty Trust after purchasing the same, and in the event, in the future, a re-sale of any portion of stock is contemplated, we agree to notify [the commission] in writing of any such contemplated sale of stock." On September 19, 1975, the commission issued an advisory ruling approving a stepped-up basis in the amount of the purchase price. The ruling did not identify the buyers or state the purchase price.

Subsequent to the issuance of the advisory ruling, James Regan determined that he could not raise all of the $50,000 necessary for the $10,000 cash payment on the purchase price and for initial operating expenses; Regan needed $25,000. Aaron Silbert, supervisor of food services at Walmont, was interested, and he and his father, Norman Silbert, a cook at Walmont, raised the $25,000. On October 2, 1975, the sellers transferred their interests in the trust and the corporation, fifty percent to the Regans and fifty percent to Norman Silbert. Norman Silbert did not assume personal liability on the first mortgage, but he did give as security for the balance of the purchase price ($1,000,000) a pledge of his stock and a mortgage of his home (later replaced by a mortgage of Aaron Silbert's home). Following the sale, one of the principals in Walmont, Nathan Korff, was hired by Stadium as its personnel manager; Norman Silbert remained as a cook at Stadium.

On October 3, 1975, James Regan wrote to the commission requesting an adjustment of Stadium's rates based on the change in ownership and the advisory ruling; the letter stated: "I purchased the Walmont Nursing Home." At the commission's request, Regan submitted a Change of Ownership form which, on the first page, listed James and Mary Regan as purchasers of Walmont. On the Disclosure of Information Schedule attached (page four), the Regans and Norman Silbert were each listed as fifty percent owners. The commission official responsible for passing on the request for a stepped-up basis did not examine the documents submitted in support of the advisory

ruling of the commission. He was not concerned with the identities of the purchasers but relied only on the advisory ruling approving what he assumed was the sale that took place. The rates subsequently set by the commission for Stadium reflected a stepped-up basis. From the final 1976 rate set on September 15, 1978, Stadium appealed to the Division of Hearings Officers (division)[4] on grounds unrelated to the use of the stepped-up basis. See G. L. c. 6A, § 36.

During preparation for the appeal, an attorney for the commission discovered that the sale of Walmont had not occurred as it had been represented prior to the issuance of the advisory ruling: the identity of Norman Silbert as a fifty percent purchaser had not then been revealed. On that account, the commission retroactively adjusted the 1976 final rate to reflect the lower basis of the sellers in the fixed assets.[5]

The division upheld the commission's action in lowering Stadium's 1976 final rate,[6] ruling that (1) the September 19, 1975, advisory ruling of the commission did not apply to the sale of Walmont to the Regans and Silbert, and (2) the commission was not estopped in 1980 from so acting. On appeal to the Superior Court, the decision of the division was affirmed. See G. L. c. 6A, § 36, & c. 30A, § 14.[7]

1. *The applicability of the September 19, 1975, advisory ruling.* It is undisputed that the change in identity of the buyers of Walmont from the Regans, as one hundred percent owners, to the Regans and Norman Silbert, each as fifty percent owners, was not brought to the attention of the commission prior to the issuance of the advisory ruling. Nor does Stadium directly contest the lawfulness of the commission's policy on "stock" sales and the basis for fixed assets thereafter or the procedure for the granting of exceptions to that policy. Rather, Stadium says, the advisory ruling applied to the sale which took place because it was essentially the same as the sale described in the application for the advisory ruling. What was important, Stadium contends, were the financial arrangements, and they

---

[4] See note 1, *supra*.

[5] Similar adjustments were made in the final rates for 1975 and 1977-1980. All the adjustments resulted in a claim by the Department of Public Welfare of about $417,000, which the department is in the process of recouping by offset.

[6] The commission's adjustments (likewise determined on the lower basis for fixed assets) to the final rates for 1975 and 1977-1980 were also subjects of appeals to the division. It was agreed that the decision with respect to the 1976 rate would control the appeals for all years, as the issues for all of the years in question were identical.

[7] It is unnecessary to detail the procedural history. The 1976 case was twice before the division and the Superior Court. Appeals were also taken from the division's summary action on the commission's adjustments to the rates for the other years in question. By stipulation, the parties agreed that the judgments would apply to the final rates for the years 1975-1980, and to the interim rate for 1981. The judgments ultimately entered (together covering all of the years in question) were based on the recommendation of a special master.

did not change. Buttressing this position, Stadium argues, are the division's findings (said by the division to be on overwhelming and compelling evidence), almost nine years after the advisory ruling and the sale, that the sale was at arm's length and that the parties were unrelated. Stadium does not argue, nor could it, that the identity of the purchasers was not material to the commission's consideration of the application for an advisory ruling; a contrived sale at an inflated price would lead to unreasonable rates. Stadium claims, however, that any infirmity in the advisory ruling was cured by the division's findings. Relying on our decision in *Woodland Estates, Inc.* v. *Rate Setting Commn.*, 15 Mass. App. Ct. 297 (1983), the division rejected these arguments, and so do we.

In *Woodland,* the court upheld the division's determination that the plaintiff was not entitled to recover certain reasonable and necessary costs of nursing care because the plaintiff had not complied with the reimbursement procedure set out in the commission's regulations. *Id.* at 298-301. The court reasoned that the failure of the plaintiff to comply with the commission's procedure "left the division with no way of knowing what the commission might have done . . . had it received, in the first instance, an application for reimbursement. . . ." *Id.* at 300.

Stadium "presented no justification to the division for its failure to comply with the commission's procedure." *Ibid.* There is nothing in the plaintiff's argument that the *Woodland* reasoning is inapplicable here because *Woodland* involved a regulation and not a policy. As noted, Stadium makes no direct attack on the lawfulness of the commission's policy. Both Stadium and the sellers knew of the policy and the procedure for exception and followed them. It is only when Norman Silbert entered the picture that the required procedure was ignored. That failure "left the division with no way of knowing what the commission might have done [had it been properly informed of the change in purchasers]." *Ibid.* Moreover, the acceptance of the plaintiff's argument, i.e., that any gap in the information supplied to the commission could later be filled by the division, "would, for all practical purposes, render the commission's [procedure] a nullity and make the division a ground level rate setter — a role reserved to the commission." *Id.* at 301. Authority in the division to cure a material defect in an application for an advisory ruling would likely signal others, perhaps apprehensive of a negative determination, to bypass commission procedure wholly or partially and would undermine administrative regularity.

2. *Estoppel.* Stadium argues that the commission was estopped in 1980 from revising rates set on the basis of the 1975 advisory ruling, not because of the ruling itself but by the passage of time following the release of the ruling during which the commission was on constructive notice that Norman

Silbert was a fifty percent owner of Stadium.[8] The argument fails for two reasons.

First, courts have generally not applied principles of estoppel to the government where to do so would frustrate legitimate requirements intended to protect the public interest. See *O'Blenes* v. *Zoning Bd. of Appeals of Lynn*, 397 Mass. 555, 558 (1986), and cases cited; *Gamache* v. *Mayor of North Adams*, 17 Mass. App. Ct. 291, 294 (1983). The public interest in assuring that rates paid to nursing homes for the care of patients eligible for public assistance are reasonable and that procedures fairly established for a determination of reasonableness are uniformly followed makes the application of the doctrine of estoppel in a case such as this inappropriate.[9] The public interest may also be expressed in terms of the obligations of those seeking public funds. "Justice Holmes wrote: 'Men must turn square corners when they deal with the Government' [citation omitted]. This observation has its greatest force when a private party seeks to spend the Government's money. Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law; [Stadium] could expect no less than to be held to the most demanding standards in its quest for public funds. This is consistent with the general rule that those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law" (footnote omitted). *Heckler* v. *Community Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 63 (1984).

Second, even if the doctrine of estoppel were held to be applicable, Stadium has failed to show all the elements of estoppel. "In order to work an estoppel it must appear that one has been induced by the conduct of another to do something different from what otherwise would have been done and which has resulted to his harm and that the other knew or had reasonable cause to know that such consequence might follow." *Boston & Albany R.R.* v. *Reardon*, 226 Mass. 286, 291 (1917). *O'Blenes* v. *Zoning Bd. of Appeals of Lynn*, 397 Mass. at 558. Stadium's claim of estoppel fails for the reason, if no other, that there is no showing in the record that Stadium did anything different from what it otherwise would have done and was thereby harmed in reliance on any conduct of the commission after the issuance of the advisory ruling (as noted, Stadium does not base its claim on the issuance of the advisory ruling). See *Gamache* v. *Mayor of North Adams*, 17 Mass. App. Ct. at 294. Stadium merely conducted its

---

[8] The division found that (1) the commission had constructive notice of Silbert's ownership by virtue of the change of ownership form submitted some time in October, 1975, and (2) the commission did not have actual notice of Silbert's ownership. Both findings are supported by substantial evidence.

[9] To the extent that Stadium's claim may be construed as one of laches, it also fails. "Laches does not run against public rights." *Sears* v. *Treasurer & Recr. Gen.*, 327 Mass. 310, 326 (1951).

business collecting public funds at rates determined on the basis of an advisory ruling which it knew or should have known did not apply to the sale which took place. The only detriment to which Stadium points "is the inability to retain money that it should never have received in the first place." *Heckler* v. *Community Health Care Servs. of Crawford County, Inc.*, supra at 61.

*Judgments affirmed.*

*William I. Cowin* for the plaintiff.
*Stephen S. Ostrach*, Assistant Attorney General, for the defendants.