BRADSTON ASSOCIATES, LLC *vs.* SUFFOLK COUNTY SHERIFF'S DEPARTMENT & another.[1]

Suffolk. May 5, 2008. - August 26, 2008.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Sheriff. Suffolk County. Boston. Municipal Corporations,* Auditor, Contracts, Lease of property.

In a civil action brought by a property owner to enforce a written lease for office space, a Superior Court judge erred in granting summary judgment in favor of the defendants (the Suffolk County sheriff and the sheriff's department, whose operations are paid for from the city of Boston's treasury), where the contract, having been approved by the proper governmental officials, was validly executed and binding on the parties, despite the city auditor's failure — for no apparent reason — to certify that an adequate appropriation was actually available to fund the agreement [279-283]; the case was remanded, however, for further proceedings to determine whether the timing of a termination notice was proper [283].

CIVIL ACTION commenced in the Superior Court Department on June 4, 2002.

The case was heard by *Allan van Gestel,* J., on motions for summary judgment.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Christopher E. Mullady (Jeffrey S. Raphaelson* with him) for the plaintiff.

*Theodore J. Folkman* for the defendants.

CORDY, J. On further appellate review, we must decide whether the failure of the auditor of the city of Boston to certify that an adequate appropriation was available to fund a lease contract entered into between Bradston Associates, LLC (Bradston), and the sheriff of Suffolk County, which was in all other respects properly executed and funded, is a sufficient ground on which

[1]Sheriff of Suffolk County. We refer to the defendants collectively as the sheriff.

to invalidate the contract. We conclude that it is not and set aside summary judgment that was entered for the sheriff.

*Facts.* From the summary judgment record, we glean the following undisputed facts. On August 13, 2001, after a public bidding process, the sheriff entered an agreement to lease office space (lease) from Bradston. The lease required Bradston to make improvements to the premises prior to occupancy. Those improvements were to be completed within six months of "the signing of this Lease." Bradston was to be paid $325,000 for the improvements and monthly lease payments were to begin thereafter. The lease also provided that it would "become[] effective only upon execution and delivery thereof by Landlord and Tenant, and upon execution of the City of Boston Standard Contract," to which the lease was to be attached.[2]

On August 16, 2001, shortly after the lease was signed, the then sheriff sent a written request to the mayor of Boston, along with a copy of the lease, seeking his approval as required by law. St. 1998, c. 262, § 1 (c. 262).[3] The sheriff also prepared a standard contract for the lease agreement. On the contract form, the total multi-year cost of the lease was listed as $6,838,580, and the source of the funding was identified as the State "grant-in-aid" provided annually to the sheriff for operations. In this case, the grant-in-aid funds identified were for fiscal year 2002.[4]

---

[2]The city of Boston standard contract was comprised of Forms CM 11 and CM 10. Form CM 11 included the standard contract terms applicable to city and county contracts generally. Form CM 10 included information about the specific terms of the lease contract. It provided space for the signatures of Bradston, the sheriff, and the city auditor. It listed the names of the parties to the contract, and included its multi-year "not to exceed" cost, as well as identifying the budgetary source of the funding.

[3]Statute 1998, c. 262, § 1 (c. 262), applies to contracts entered into by officials of Suffolk County, including the sheriff. It provides, in relevant part: "All contracts made by . . . any officer, board or official of the county of Suffolk having power to incur obligations on behalf of said county in cases where said obligations are to be paid for wholly from the treasury [of Boston], shall, when the amount involved is $10,000 or more, . . . be in writing; and *no such contract shall be deemed to have been made or executed until the approval of the mayor of said city has been affixed thereto in writing and the auditor of said city has certified thereon that an appropriation is available therefor* or has cited thereon a statute under authority of which the contract is being executed without an appropriation" (emphasis added).

[4]When the government makes multi-year contracts involving continuous

Those funds were earmarked for the sheriff in a line item of the fiscal year 2002 State budget.

The standard contract form was sent by the sheriff to Bradston for signature. Bradston signed and returned it on August 23, 2001. The sheriff then forwarded it to the auditor for preliminary review in anticipation of review and approval by the mayor, and a final award by the sheriff as the contracting authority. A senior accountant in the auditor's office reviewed the contract to confirm that there was "budget authority" for the lease, and that funds would be available through the identified source (sheriff's grant-in-aid appropriation). Having confirmed these facts, she initialed the standard contract and forwarded it on to the auditor for her signature. She signed the contract on September 20, 2001. Her signature, "[a]pproved [the contract] as to the availability of appropriation . . . in the amount of $0.00." Approvals "in the amount of $0.00" were routinely done by the auditor to expedite the contracting process by enabling the contract to move to the next round of required approvals by the parties and the mayor.

Passage of the fiscal year 2002 State budget was delayed, as was the completion of the contract approval process. The budget was approved on December 1, 2001. The amount of the grant-in-aid appropriated for the sheriff in the budget was a "minimum" of $75.6 million. When enacted, the appropriation was sufficient and available to fund the first year of the contract. See note 4, *supra*. Three days later, on December 4, 2001, the mayor affixed his written approval to the sheriff's letter of August 16, 2001, requesting permission to award the lease to Bradston. Having secured the appropriation, the mayor's written approval of the lease, and the preliminary certification from the city auditor, the sheriff, through his chief financial officer,

expenditures, such as this one, it would be unreasonably restricted if an up-front appropriation for the entire expense was required; thus, we have read prohibitions on contracting in excess of available appropriations to require only an adequate appropriation for the current fiscal year's expenses. See *Boston Teachers Union, Local 66* v. *School Comm. of Boston*, 386 Mass. 197, 208 (1982); *Clarke* v. *Fall River*, 219 Mass. 580, 586 (1914) (where law authorizes making of contract for performance of constantly recurring duties to run for more than one year, entire sum to be paid for several years need not be appropriated at start). The amount needed to fund the first year, including improvements, is disputed, but falls between $650,000 and $925,000. This variation is not material to the resolution of the issues in this case.

signed the contract on December 12, 2001, as the "awarding authority/official." A copy of the contract was then sent to Bradston, and the original was sent back to the city auditor for final approval.

The same senior accountant in the auditor's office who conducted the preliminary review then finished processing the contract in accord with the standard procedures of the auditor's office. She confirmed that all of the required signatures had been obtained, and that the appropriation source had been sufficiently identified. On January 2, 2002, as she was authorized to do, she stamped the contract, "EXECUTED," and affixed her signature. At that point, the contract became a "formal document of the city," was kept on record as an "approved" contract, and was so recorded in the city's computer software system.

In the final processing of the contract through the auditor's office, the auditor did not change her certification from the "$0.00" amount to the approved and funded contract amount.[5] The sheriff and Bradston, however, understood that the contract had been approved and proceeded accordingly. Financing for the required improvements had been obtained by Bradston and work on the improvements was in progress, subject to the sheriff's direction and oversight.

On February 13, 2002, the sheriff announced cuts to his operating budget. On February 14, 2002, the sheriff sent a notice of termination of the contract to Bradston. As grounds therefor, the sheriff contended that Bradston had violated the terms of the lease when it failed to complete the "required construction" by February 13, 2002, more than six months after the lease had been signed on August 13, 2001. Bradston responded by initiating this law suit for breach of contract, essentially contending that the lease contemplated that the six-month period was to begin when the lease became effective, which it claims was on December 12, 2001 (when the sheriff's chief financial officer signed the lease, after the appropriation had become available and the mayor had approved the award).

---

[5]It is unclear whether this failure was due to inadvertence, negligence, or inadequate procedures. There was evidence that other contracts were routinely routed and approved with an appropriation availability of "$0.00," including another contract between the sheriff and Bradston that remains in full effect.

A judge in the Superior Court granted the sheriff's motion to dismiss, concluding that the lease was not ambiguous on this point and its termination by the sheriff was valid when the improvements were not completed in six months. In an unpublished memorandum and order pursuant to its rule 1:28, the Appeals Court reversed, concluding that the date of the "signing" intended to trigger the six-month period in the lease was uncertain in light of the various approval requirements of c. 262, including the written approval of the mayor and certification by the city auditor that an appropriation is available to fund it. *Bradston Assocs.* v. *Cabral*, 61 Mass. App. Ct. 1116 (2004). The court further ruled that "extrinsic evidence of the circumstances leading to the execution of [the lease] may be considered in resolving" this uncertainty. Consequently, it concluded that "dismissal of the complaint was premature" and remanded the matter to the Superior Court.

Following remand, discovery was taken, and the sheriff sought summary judgment, this time on the ground that the lease had not been executed because the city auditor had not properly certified that an "appropriation is available" to fund it (or cited "the statute under the authority of which the contract [was] being executed without an appropriation") as required by c. 262. The judge granted the sheriff's motion on that ground, and the Appeals Court affirmed. *Bradston Assocs.* v. *Cabral*, 70 Mass. App. Ct. 822 (2007).

Because we conclude that the contract was validly executed and binding on the parties, we reverse, order summary judgment be entered for Bradston on the question of the validity of the contract, and remand the case for further proceedings with respect to the parties' intention regarding the date when the six-month period for the completion of the improvements was to commence.

*Discussion.* We have stated generally that "[p]ersons dealing with a municipality must take notice of limitations . . . upon the contracting power of the municipality and are bound by them and cannot recover upon contracts attempted to be made in violation of them." *Marlborough* v. *Cybulski, Ohnemus & Assocs.*, 370 Mass. 157, 160 (1976), quoting *Duff* v. *Southbridge*, 325 Mass. 224, 228 (1950); *Lawrence* v. *Falzarano*, 380

Mass. 18, 24 (1980) (*Lawrence*); *Adalian Bros.* v. *Boston*, 323
Mass. 629, 631 (1949). However, when a contract is entered
into by a proper official, and supported by budgetary authority,
the government is bound like any other contracting party. Cf.
*Cherokee Nation of Okla.* v. *Leavitt*, 543 U.S. 631, 637, 642
(2005) (where Congress appropriated sufficient unrestricted
funds for contract, government could not, on grounds of "insuf-
ficient appropriations," avoid contractual promise).

   In *Lawrence, supra* at 25, we explained that, although strict
compliance with a statute concerning municipal contracts is
preferable, it is not required in all circumstances, and should
not be required when it would frustrate the statute's purpose. In
that case, we were interpreting G. L. c. 44, § 31C, regarding
the award of municipal construction contracts. Its wording is
similar to that of c. 262, with respect to the function of the
auditor, that is, such contracts are not "deemed to have been
made" until the auditor "has certified that an appropriation in
the amount of such contract is available therefor." The facts in
*Lawrence* are also similar to the case here. A contract for the
renovation of a hospital was executed without the requisite
auditor's certification of an available appropriation. It was none-
theless executed by the appropriate city officials, and the city
council appropriated $1,500,000 for the renovation, an amount
more than adequate to fund the contract. The court concluded
that, "[w]here it is unquestioned that the contract was executed
by a proper city official and that a sufficient appropriation existed
in fact to cover the cost of the contract . . . the contract is not
necessarily invalid because it lacks on its face the certification
required by [G. L.] c. 44, § 31C." *Id.* at 25.

   The *Lawrence* court went on to explain that one of the pur-
poses of G. L. c. 44, § 31C, is to " 'provide contractors engaged
in public construction work with a ready and reliable means of
ascertaining that there is an appropriation sufficient to cover the
proposed work and to protect them where the contract carries a
certification that there exists a sufficient appropriation,' but no
such appropriation exists." *Id.*, quoting *Lawrence* v. *Falzarano*,
7 Mass. App. Ct. 591, 597 (1979). Accordingly, we concluded
that the contractor was an intended beneficiary of the statute
and that a contrary result (invalidating the contract) would al-

low the city to benefit from its omission, and would conflict with statutory intent. As in the case before us, the contract at issue in *Lawrence* had gone through the full public bidding process, the city had held it out as awarded and exacted performance under it, and the spending authority was unquestioned.[6]

In *Lawrence*, we distinguished *Ryan* v. *Somerville*, 328 Mass. 324 (1952), in which a contract was invalidated when there was no indication that an appropriation had ever been made for it, as was required under the city charter at issue in that case.[7] *Id.* at 25. The *Lawrence* court emphasized that, unlike in *Ryan* v. *Somerville*, *supra*, there was no question that ample appropriation existed for the contract. The court also noted that there was no indication that the city charter (under which the contract was awarded) intended to afford any protection to parties contracting with the city, as contrasted to its interpretation of G. L. c. 44, § 31C. *Id.* at 25-26.

In *Reynolds Bros.* v. *Norwood*, 414 Mass. 295, 301 (1993), we affirmed our holding in *Lawrence*, concluding that the "legislative purpose [of G. L. c. 44, § 31C,] would not be served, but instead would be frustrated" by a decision that the contract in question "was invalidated by the absence of a certification" of an available appropriation for a multi-million dollar municipal airport project that had otherwise been approved and funded.

We conclude that c. 262 serves much the same purpose for contracts awarded by Suffolk County officials as G. L. c. 44, § 31C, serves for construction contracts awarded by cities and towns. Applying the reasoning of *Lawrence* leads us to the same conclusion. Where the proper (city and county) officials have approved a contract, and an adequate appropriation is available to fund it, the failure of the auditor (for no apparent reason) to certify the availability of that appropriation will not be a suf-

---

[6]In *Lawrence* v. *Falzarano*, 380 Mass. 18, 24 (1980), there was a complete omission of review by the auditor; here, the contract was submitted to the auditor for review and certification both before and after it was fully approved by city officials and funded by the State grant-in-aid appropriation.

[7]In *Ryan* v. *Somerville*, 328 Mass. 324, 325 (1952), a city charter stated that "[n]o contract . . . shall be awarded by the city unless and until the city auditor has certified on said contract or order that there is an unencumbered balance in the appropriation chargeable therefor sufficient to cover the cost of said labor . . . ."

ficient ground on which the county can seek to set aside the contract as invalid. This is particularly the case where, as here, the auditor's office processed the contract, deemed it executed, and was fully aware of the availability of the appropriation. To hold otherwise would sacrifice substance to form and perpetrate an unfairness contrary to the purpose of the statute's intent.[8]

Our conclusion is consistent with the auditor's limited role under c. 262. Chapter 262 requires the auditor to certify that the contract is supported by budget authority. This is a ministerial, nondiscretionary verification of existing budgetary authority. Cf. *Pirrone* v. *Boston*, 364 Mass. 403, 408 n.9 (1973) ("No discretion or judgment is required of the city auditor in performing the arithmetic required by [statute]").[9] There either is or is not an appropriation available to fund the contract. Where, as in this case, there clearly is such an appropriation, the auditor

---

[8] See *Singarella* v. *Boston*, 342 Mass. 385, 387 (1961), in which St. 1950, c. 216, § 1, an earlier version of c. 262, was interpreted. That version provided that all contracts over $1,000 must be in writing and "no such contract shall be deemed to have been made or executed until the approval of the mayor of said city has been affixed thereto." In that case, the mayor approved the contract prior to its execution, and we deemed that action sufficient to bind the city on subsequent execution of the contract. *Id.* That the signature of approval appeared merely on the letter informing him of a hospital's board of trustees' desire to award the contract (which was stapled to the contract at all times), and not on the contract, did not constitute a violation of the statute. *Id.* at 387-388. We acknowledged that, when the mayor signed the letter, he was not approving an executed contract. We concluded, however, that "[s]o long as the mayor has approved the specific contract relied upon, substantial compliance with the statute [was] sufficient," *id.* at 388, and that once the mayor approved the contract prior to its execution, it would be an idle ceremony sacrificing substance to form to require him to approve it after execution.

[9] The auditor's role contrasts to that of the mayor. "[M]ayoral approval is not something which can be sloughed off as a mere ministerial act." *Lumarose Equip. Corp.* v. *Springfield*, 15 Mass. App. Ct. 517, 519-520 (1983), and cases cited (city purchasing agent's actions in purporting to extend lives of contracts without written approval of mayor left city in position that no contract was made or executed). The mayor's action, signing and approving a contract, is required; the mayor may withhold approval if he chooses. Cf. *Urban Transp., Inc.* v. *Mayor of Boston*, 373 Mass. 693, 697 (1977), quoting *McLean* v. *Mayor of Holyoke*, 216 Mass. 62, 64 (1913) (discussing mayoral approval requirement and stating that "mayor must be able to exercise his 'practical wisdom in the administration of the affairs of the city' "). The auditor's certification, on the other hand, is a nondiscretionary verification of existing legal and budgetary authority.

would not have had any basis to withhold certification. The contract is valid.

*The six-month period.* The question when the six-month period began to run, and thus whether the termination notice was proper, was left open after the Appeals Court's reversal of the initial grant of the sheriff's motion to dismiss. It is evident from the record that there are disputed material facts as to when the six-month period began, and the case must be remanded for such determination.

*Conclusion.* Judgment for the sheriff is vacated and summary judgment on the validity of the contract is to be entered for Bradston. The case is remanded for further proceedings consistent with this opinion.

*So ordered.*