MORTON STREET LLC & another[1] *vs.* SHERIFF OF SUFFOLK
COUNTY & others.[2]

Suffolk. February 2, 2009. - March 31, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Sheriff. Landlord and Tenant,* Termination of lease. *Contract,* Lease of real
estate, Promissory estoppel. *Real Property,* Lease. *Estoppel.*

In a civil action arising from the defendant sheriff's early termination of a
lease within the city of Boston (city) for office space that the defendant
entered into with the plaintiff landlord, the judge properly granted sum-
mary judgment in favor of the defendant, where the plaintiff was given fair
warning in the request for proposals (RFP) that preceded the signing of the
lease that it would have to accept general conditions appearing in a particular
form required by the city as part of any contractual agreement with the
defendant if the plaintiff's proposal were accepted, and the termination
provision in the form did not conflict with the term of the lease requested
in the RFP [490-491]; where principles of estoppel did not apply to nullify
the plain language of the form based on a prior oral agreement with the
defendant's procurement team leader that the termination provision would
not be binding, in that the plaintiff's reliance on that oral agreement was
not reasonable, and the facts of the case did not equitably cry out for ap-
plication of the principles of estoppel [491-493]; and where the defendant
acted in accordance with the terms of the form in terminating the lease
after losing the funding for it [493-494].

CIVIL ACTION commenced in the Superior Court Department
on January 6, 2004.

The case was heard by *Margaret R. Hinkle,* J. on motions for
summary judgment.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Sander A. Rikleen* (*Hilary B. Dudley* with him) for the
plaintiffs.

*Russell T. Homsy* for the defendants.

GANTS, J. In this case we must decide whether the sheriff of

[1]Debbie, LLC.

[2]Suffolk County sheriff's department and Suffolk County. We refer to the
defendants collectively as the sheriff. The liability of Suffolk County, however,
is not at issue.

Suffolk County may terminate a ten-year lease entered into with Morton Street LLC[3] after the sheriff lost outside funding for the lease three years into the lease. We conclude that the sheriff lawfully terminated the lease.

*Background.* The material, undisputed facts are as follows.[4] Prior to March, 2000, the sheriff issued a request for proposal (RFP) inviting offers to lease a minimum of 5,000 square feet of office space near the West Roxbury District Court House for use as a community corrections facility to be operated by the sheriff.[5],[6] The RFP provides that it would be "highly advantageous" if the lease term was for ten or more years. Under Part 1 of the RFP, entitled "RFP General Information, Bid Submission Requirements and Other Terms and Conditions," the RFP incorporates by reference the city of Boston (city) standard contract (known as Form CM 10), and general conditions (known as Form CM 11). The RFP declares that these forms are provided in "Attachment C," but the RFP provided to Morton Street did not include the attachment. The RFP, however, names William Sweeney as the "Procurement Team Leader," and provides his contact information, including his telephone number, "in the event this RFP is incomplete or the Proposer is having trouble obtaining any required attachments."

The general conditions in Form CM 11 provide that the contract is "subject to the availability of an appropriation therefor," and includes a termination provision in § 8.4 that states:

"This Contract may be terminated at any time for the

---

[3]Debbie, LLC, is the current owner of the premises subject to the lease, and is the successor to Morton Street LLC's interest in the lease. We refer to Morton Street LLC and Debbie, LLC, collectively as Morton Street.

[4]Because we are reviewing the allowance of summary judgment in favor of the sheriff, where facts are in dispute, we accept the version set forth by the losing party, here, Morton Street. See *Graham* v. *Quincy Food Serv. Employees Ass'n & Hosp., Library & Pub. Employees Union*, 407 Mass. 601, 603 (1990).

[5]The community corrections facility was intended to be (and was) used as a women's resource center, "a nonresidential, administrative custody program for female offenders [providing] educational, employment and counseling services."

[6]In connection with the sheriff's request for proposal (RFP), the city of Boston (city) and Suffolk County issued a separate RFP for the benefit of the sheriff "for [the provision of] goods and services and performing . . . work." This separate RFP is not at issue in this case.

convenience of the City at the option of the Official by delivering or mailing to the Contractor at the Contractor's business address a written notice of termination setting forth the date, not less than seven (7) days after the date of such delivery or mailing, when such termination shall be effective."

The RFP recognizes the possibility of a conflict between its express terms and the forms it incorporated (Forms CM 10 and 11), as well as amendments to the RFP and "Proposer Response Content," and specifies how any such conflicts should be resolved. Under this contractual order of preference, the RFP terms took precedence, followed by Form CM 11, and then by Form CM 10.

In response to the RFP, Morton Street tendered a proposal on March 9, 2000, offering to lease space in an office building at 113-123 Morton Street in the Jamaica Plain section of Boston. Morton Street and the sheriff then engaged in negotiations for the lease of office space in these premises, which resulted in the execution of a lease on June 1, 2000.

Under the lease, the sheriff agreed to lease the office space for ten years, commencing on the delivery of the premises to the sheriff when Morton Street's required improvements were substantially completed. The lease does not include any provision giving the sheriff or the city the right to terminate the lease with seven days' notice "for the convenience of the City." Indeed, the lease provides that, if the sheriff were to fail to pay the required fixed or additional rent, Morton Street, after giving the sheriff written notice and thirty days to cure its default, was entitled to repossess the premises and to be indemnified by the sheriff for any loss of rent it may suffer during the remaining term of the lease. The lease, however, expressly states: "This Lease is subject to the City of Boston and its Law Department's approval of the contract between the City of Boston and Landlord, which approval Tenant shall seek to secure as promptly as reasonably possible." The lease further provides that, if the tenant, despite its diligent efforts, were unable to obtain the city's approval, "the obligations of each party hereto will terminate and be of no further force or effect."[7]

---

[7]While the city apparently provides only approximately five per cent of the

On June 19, 2000, the sheriff wrote to the mayor of Boston asking him to approve the lease. On June 26, 2000, Sweeney sent a note to Morton Street requesting that its manager, Charles Sullivan, sign the city's standard contract (Form CM 10), with the general conditions contained in Form CM 11. Sullivan recognized that Form CM 11 included a termination provision that had not been contained in the lease, and told Sweeney by telephone that he would not sign it because it contradicted the lease.[8] Sweeney explained that the execution of the form was an administrative requirement that had to be satisfied if any checks were to be paid to Morton Street for the lease payments. Sullivan told Sweeney, "I will sign it and send it back, but only if we agree that basically this form is meaningless, that the numbers are inaccurate and the lease is the controlling document." Sweeney agreed, and Sullivan returned the executed standard contract on June 28, 2000, with a cover letter confirming "our conversation that the terms of the lease will control over any inconsistent provision of the Standard Contract." Neither Sweeney, nor anyone else on behalf of the sheriff, responded to Sullivan's letter, or otherwise indicated to Morton Street that they disagreed with its contents. On July 14, 2000, the auditor for the city signed Form CM 10, approving the availability of an appropriation for the rent. Thomas Yotts, the chief financial officer for the sheriff, also signed the form as the "awarding authority/official," but did not affix a date. On July 26, 2000, the mayor approved the lease.

The sheriff occupied the leased premises for three years. During that time period, the entire cost of the lease was paid from funds provided by the Administrative Office of the Trial Court's office of community corrections (OCC). However, OCC was not able to continue to fund the lease into the fourth lease year,

sheriff's funding, with the balance coming from State funds and grants, all checks written on behalf of the sheriff to vendors or contractors are issued by the city. Therefore, all contracts entered into by the sheriff had to be approved by the city and its law department.

[8]Charles Sullivan also noted that the total amount of rent to be paid over the ten-year term of the lease was in error on the standard contract, because the lease provided for the annual rent to be adjusted at the beginning of each successive lease year based on changes in the consumer price index, but the amount stated in the standard contract assumed no adjustments during the ten years.

which commenced at the same time as the new fiscal year on July 1, 2003. Having lost the OCC funding and faced now with the prospect of having to find the funds to pay the lease from its own budget, the sheriff decided to terminate the lease.[9] On July 2, 2003, the sheriff sent a letter of termination to Morton Street, declaring that, pursuant to the termination clause in Form CM 11, the lease was being terminated "for the convenience of the City." Morton Street responded by commencing suit in January, 2004, alleging that the termination was in breach of the lease.

Morton Street filed a motion for partial summary judgment, contending that the lease provided for a ten-year term and did not permit early termination. The sheriff filed a cross motion for summary judgment asserting that (1) the lease was void under § 12 (*b*) of the Uniform Procurement Act (Act), G. L. c. 30B, because it exceeded three years in duration without the requisite authorization by a majority of the county commissioners[10]; (2) the lease could be terminated under G. L. c. 30B, § 12 (*a*), because OCC terminated its funding for the lease and adequate funds were not available in the sheriff's budget to make the lease payments[11]; and (3) early termination of the lease was permissible under Form CM 11's termination provision. In a carefully considered opinion, a Superior Court judge agreed with the sheriff's two arguments under G. L. c. 30B, § 12 (*a*) and (*b*), and granted summary judgment for the sheriff. A judgment entered dismissing the complaint, and Morton Street appealed. We transferred the case here on our own initiative.

---

[9]At the time, the sheriff was grappling with difficult budgetary issues, including a $5.4 million deficit for fiscal year 2003, with fiscal year 2004 looking equally bleak. The $5.4 million deficit for fiscal year 2003 derived in part from the settlement of a large Federal tort action against the sheriff. Payment in accordance with the settlement had been due since November, 2002, interest was accruing, and the settlement had not been fully funded by the Commonwealth.

[10]General Laws c. 30B, § 12 (*b*), provides in part: "Unless authorized by majority vote [here, of the county commissioners], a procurement officer shall not award a contract for a term exceeding three years . . . ."

[11]General Laws c. 30B, § 12 (*a*), provides in part: "The procurement officer shall not enter into a contract unless funds are available for the first fiscal year at the time of contracting. Payment and performance obligation for succeeding fiscal years shall depend on the availability and appropriation of funds."

We affirm the judge's grant of summary judgment, but on different grounds, namely, that under general contract principles, the sheriff was entitled to terminate the lease in accordance with Form CM 11's unambiguous termination provision.[12] Because we affirm on this ground, we do not consider whether the sheriff would also be entitled to summary judgment on either or both of the grounds relied on by the Superior Court judge. Nor do we consider whether the sheriff is a "governmental body" under the Act, whose contracts for the procurement of supplies or real estate are governed by the Act.[13] Nor do we consider whether, if the sheriff's contracts were governed by the Act, its leasing of real estate would be governed solely by the provisions of G. L. c. 30B, § 16, rather than the bidding requirements and limitations in G. L. c. 30B, § 12.[14]

*Discussion.* Morton Street was given fair warning in the RFP that it would need to accept the general conditions in Form CM 11 as part of any contractual agreement with the sheriff if its proposal were accepted. Morton Street contends that it had no fair warning because it was not provided with a copy of Form CM 10 or Form CM 11 as "Attachment C" to the RFP.

---

[12]This case does not represent the first occasion we have reviewed the sheriff's decision to terminate a lease. In *Bradston Assocs., LLC* v. *Suffolk County Sheriff's Dep't*, 452 Mass. 275, 275-276 (2008) (*Bradston*), we concluded that the "failure of the auditor of the city of Boston to certify that an adequate appropriation was available to fund a lease contract entered into between Bradston Associates, LLC . . . and the sheriff . . . , which was in all other respects properly executed and funded" was an insufficient ground on which the sheriff could invalidate the lease. Although the lease in the *Bradston* decision became effective only on the execution of the city's standard contract and general conditions (Forms CM 10 and 11), the sheriff never sought to terminate the lease based on the termination provision in Form CM 11. *Id.* at 276 & n.2. Therefore, the termination provision that proves decisive here was never addressed in *Bradston*.

[13]A "[g]overnmental body" under the Uniform Procurement Act is defined as "a city, town, district, regional school district, county, or agency, board, commission, authority, department or instrumentality of a city, town, district, regional school district or county." G. L. c. 30B, § 2. Morton Street contends that the sheriff's department is "a long-standing public entity, independent of both Suffolk County and the City of Boston and therefore outside the scope of G. L. c. 30B."

[14]Our conclusion also obviates the need to resolve Morton Street's contention that the sheriff's statutory defenses under G. L. c. 30B, § 12, were waived because they were not pleaded as affirmative defenses in the sheriff's answer.

While Form CM 11 (and Form CM 10) should have been provided as the promised "Attachment C" to the RFP, the RFP invited those submitting proposals to contact the procurement team leader, whose name and contact information were provided, "in the event this RFP is incomplete or the Proposer is having trouble obtaining any required attachments."

Contrary to Morton Street's argument, the ten-year lease term requested in the RFP is not in conflict with the termination provision in Form CM 11, so the RFP need not take precedence as to termination. While the RFP seeks at least a ten-year lease term, it does not speak of termination. When read together with Form CM 11, which the RFP expressly incorporates and which sets forth an unambiguous termination provision, the RFP seeks a lease for at least ten years that would be terminable with seven days' notice by the designated official "for the convenience of the City."

The lease later negotiated between the sheriff and Morton Street, while it did not initially incorporate the general conditions in Form CM 11, provided that the lease was null and void without the city's approval. It was soon made clear to Morton Street that the city's approval was conditioned on Morton Street's execution of Forms CM 10 and 11, which gave the sheriff a right of termination on seven days' notice that had not been provided in the lease and which declared that the lease was "subject to the availability of an appropriation therefor." Morton Street executed Form CM 10, with the general conditions as stated in Form CM 11, knowing that the terms of the general conditions of this standard contract modified the lease provision regarding termination. Morton Street, however, understood that its oral agreement with Sweeney, later memorialized in writing by Sullivan's cover letter, made Form CM 11 effectively "meaningless." Morton Street contends that this prior oral agreement with the sheriff's procurement team leader supersedes the plain language of the written standard contract it later executed and that, essentially, the sheriff should be estopped from enforcing a termination provision that her agent orally agreed would not be binding.

We have been "reluctant to apply principles of estoppel to public entities where to do so would negate requirements of law

intended to protect the public interest." *Phipps Prods. Corp.* v. *Massachusetts Bay Transp. Auth.*, 387 Mass. 687, 693 (1982), and cases cited. This traditional reluctance had been justified by the need to protect the public from improper collusion by public officials, deference to legislative policy, concern about the public fisc, and administrative efficiency. *McAndrew* v. *School Comm. of Cambridge*, 20 Mass. App. Ct. 356, 360 (1985). The rule against applying estoppel to the government has applied "where a government official acts, or makes representations, contrary to a statute or regulation designed to prevent favoritism, secure honest bidding, or ensure some other legislative purpose." *Id.* at 361. Consequently, when a public authority failed to follow statutory bidding procedures, we allowed the public authority to renege on an agreement to sell public property, even while recognizing that the public authority's conduct "would hardly qualify it for a 'sportsmanship' award," that the private party reasonably may conclude "that it was treated most unfairly," and that we "would extend little sympathy to a private citizen who acted similarly in a private transaction." *Phipps Prods. Corp.* v. *Massachusetts Bay Transp. Auth.*, *supra* at 693, 694.

Here, the oral agreement made by Sweeney was not contrary to any statute or regulation, but it was contrary to a written agreement soon to be entered into by the sheriff, Morton Street, and the city. The application of estoppel principles would be equally inappropriate here. To permit a private party, through a prior oral agreement with a government official, to nullify a subsequent written contract with a governmental entity would invite confusion and uncertainty in public contracting and endanger the public fisc. See *Stadium Manor, Inc.* v. *Division of Admin. Law Appeals*, 23 Mass. App. Ct. 958, 962 (1987), quoting *Heckler* v. *Community Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 63 (1984) ("Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law . . . . This is consistent with the general rule that those who deal with the [g]overnment are expected to know the law and may not rely on the conduct of [g]overnment agents contrary to law").

"The reliance of the party seeking the benefit of estoppel must have been reasonable." *O'Blenes* v. *Zoning Bd. of Appeals*

*of Lynn,* 397 Mass. 555, 558 (1986). See *Franklin County Realty Trust* v. *Assessors of Greenfield,* 391 Mass. 1018, 1018-1019 (1984); *Ford* v. *Rogovin,* 289 Mass. 549, 552 (1935); *Calnan* v. *Planning Bd. of Lynn,* 63 Mass. App. Ct. 384, 390 (2005). In the circumstances of this case, where the lease states that it was subject to the city's approval, we conclude, as a matter of law, that it was not reasonable for Morton Street to rely on a representation by Sweeney that the city's standard contract and general conditions (Forms CM 10 and 11) would be meaningless even after the standard contract was executed. Form CM 11 granted a right of termination that had not been provided in the lease. It was unreasonable for Morton Street to assume that the right it had granted in a written contract with the sheriff and the city would not exist or never be enforced based on Sweeney's oral representations.

Nor do the facts of this case equitably cry out for this court to overcome its historic reluctance to apply principles of estoppel to public entities. Morton Street executed a standard contract with the city knowing that the city required the contract to be executed before it would issue checks for the monthly lease payments. Under the oral agreement it made with Sweeney, the city would have continued to issue these checks, believing that Morton Street, by signing the standard contract, had accepted the general conditions when, in fact, Morton Street had rejected the termination provision of those general conditions. To grant estoppel here would mean enforcing an oral agreement whose sole purpose was to mislead the city.

Morton Street further contends that the sheriff could not terminate the lease pursuant to the termination clause because that clause permits termination only "for the convenience of the City," and not for the convenience of the sheriff. Morton Street ignores the language that follows that phrase, which provides that termination is permissible "at any time for the convenience of the City *at the option of the Official*" (emphasis added). "Official" is a defined term in Form CM 11, meaning "the awarding authority/officer acting on behalf of the City in the execution of the Contract."[15] The chief financial officer for the sheriff executed Form CM 10 as the "awarding authority/official."

---

[15]The city is also a defined term in Form CM 11, meaning "the City of Boston or the County of Suffolk."

Morton Street argues that the phrase "for the convenience of the City" used in the termination clause of Form CM 11 should not be interpreted to allow termination of the lease at will and without regard to the needs of the city (as opposed to the sheriff). As defined in the American Heritage Dictionary of the English Language 411 (3d ed. 1996), the word "convenience" means the "quality of being suitable to one's comfort, purposes, or needs." Implicitly, when termination is permitted "for the convenience of the City," the city (here, the sheriff, acting for the city) may terminate the lease when continuing it would become inconvenient for the city. Here, Form CM 11 provided clear notice that the lease could be terminated if its funding dried up when it declared that "[t]his Contract is subject to the availability of an appropriation therefor." We need not determine the full extent of the sheriff's discretion to terminate a contract "for the convenience of the City," because, pursuant to the general conditions, losing the funding for the lease is plainly an inconvenience justifying termination. Having lost the funding from the OCC that had previously paid the entire annual cost of the lease, the sheriff now had to determine whether to find money within her own budget to pay for the lease. Because she was already faced with a considerable deficit, funding this lease would have meant reducing or eliminating the funding devoted to other obligations or programs. See note 9, *supra.* The decision to close the community corrections facility and terminate the lease is among the many challenging decisions that public officials with considerable obligations and limited resources often need to make, especially during difficult fiscal times, in order to allocate available resources more suitably to the sheriff's purposes or needs. In these circumstances, we conclude that the sheriff acted in accordance with Form CM 11 when she terminated the lease "for the convenience of the City," and did not commit a breach of the lease by doing so.

*Judgment affirmed.*