# United States Court of Appeals
## For the First Circuit

No. 08-1663

INTERNATIONAL SALT COMPANY, LLC,

Plaintiff - Appellant,

v.

CITY OF BOSTON,

Defendant - Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard Stearns, U. S. District Judge]

Before

Boudin, John R. Gibson,[*] and Howard,
Circuit Judges.

Bruce W. Edmands with whom Julia B. Vacek and Eckert Seamans Cherin & Mellott, LLC were on brief for appellant.
Adam Cederbaum with whom William F. Sinnott, Corporation Counsel, and Scott C. Holmes, Assistant Corporation Counsel, City of Boston Law Department, were on brief for appellee.

December 18, 2009

[*]Of the Eighth Circuit, sitting by designation.

**JOHN R. GIBSON, <u>Circuit Judge</u>.** International Salt Company, LLC ("International Salt") appeals from the district court's entry of judgment for the City of Boston ("City") in a dispute over payment for road salt that the company supplied during the winter of 2004-05. The City awarded a contract to International Salt to supply 75,000 tons of road salt for that winter, but its supply dwindled midway through the season after several unusually heavy snows hit the area. In early February 2005, the City demanded another 25,000 tons of salt, which International Salt said it could provide but at a higher price because its shipping costs had risen. The City was insistent in its demand but did not agree to pay more than the original contract price. International Salt supplied the additional salt after the City characterized the situation as a public safety issue for which it would hold the company responsible, but the company reserved the right to litigate the price. True to its word, the City paid the same rate per ton as it had under the contract, and this suit followed. The district court entered judgment for the City of Boston following a non-jury trial. International Salt appeals, arguing: 1) the parties' failure to comply with the Massachusetts Uniform Procurement Act was excused under the Act's emergency provisions; 2) the District Court erred in holding that International Salt's claims are barred by its failure to show that it strictly complied with the Boston City Charter; and 3) it should

be permitted to assert equitable estoppel against the City. We will affirm the judgment.

## I.

The parties largely stipulated to the relevant facts. International Salt was the successful bidder to supply the City with 75,000 tons of road maintenance salt for the period between October 1, 2004 and June 30, 2005. The contract received both the written approval of the Mayor of Boston and approval by a city official that appropriations were available. From November 2004 to March 2005, Boston received more than eighty-five inches of snow, with roughly half falling in January. Road salt is critically important during winter snow and ice storms, and its absence poses a significant threat to public health and safety. Without it, the City's streets become dangerous to vehicles and pedestrians. Effective use of road salt requires that the City apply it to streets and highways before, during, and after storms.

The City wrote the contract at issue. The only provision over which International Salt had any control was the bid (and ultimately, the contract) price. This lawsuit arose because the parties could not agree on an interpretation of certain contract language. The first dispute is over an incorporated contract provision of the City's invitation for bids, which reads: "Price will be held for the term of the contract and shall not be limited

to the estimated number of items." However, the City did not use the word "estimated" anywhere else in the contract documents.

In addition to uncertainty over the word "estimated," the contract contains other ambiguities. The signature page of the contract, in listing the terms, states that the "total amount [of the contract is] not to exceed $2,731,500.00." That figure is derived from multiplying 75,000 tons by $36.42, the price bid per ton. The bid response form contains two additional pertinent statements. First, in the space allotted to the "total bid price" for the contract, International Salt recorded it as $36.42 a ton, for a total of $2,731,500.00. Second, where asked to list the price components of the bid price, International Salt wrote: "Total contract. Based upon 75,000 tons."

As of the first week of February 2005, International Salt had delivered 70,848 tons of salt to the City, and the City had approximately 28,117 tons remaining in its storage yards. Much of the winter was yet ahead, and the City's Public Works Superintendent, Joseph Canavan, liked to keep the reserves above 20,000 tons because of the uncertainty of weather and the problems caused by running out of salt.

On February 7, Daniel Thompson, vice president of government sales for International Salt, faxed a letter to Vincent Caiani, an Assistant Purchasing Agent for the City, informing him that an increase in ocean freight rates would cause International Salt to

-4-

increase its price of salt from $36.42 a ton to $46.36 a ton, effective with any shipments above the 75,000 tons specified in the contract. That same day, Mr. Caiani telephoned Mr. Thompson to ask that International Salt provide the City with additional salt in excess of 75,000 tons, but at the contract price of $36.42 per ton. They disagreed over whether International Salt was obligated to provide it. The next day, Mr. Thompson spoke with William Hannon, the City's Purchasing Agent. Mr. Hannon said that the City was precluded by Massachusetts General Laws chapter 30B from agreeing to pay more than $36.42 per ton, and Mr. Thompson took the position that International Salt had fulfilled its obligations under the contract by supplying the City with 75,000 tons of salt and that it could not supply additional salt at the same price because shipping costs had increased. As these conversations were taking place, the City was applying salt to its streets, and its supply diminished by nearly 3000 tons in one day.

The parties continued to discuss this issue, with each side holding fast to its position. Ultimately, on February 10, the Boston Commissioner of Public Works, Joseph Casazza, telephoned International Salt's Chief Executive Officer, Robert Jones, to demand written assurance that the company would continue to supply the City with salt. The Commissioner presented his demand as a safety issue; it was the middle of winter, in emergency conditions, and he did not want the City to be shut down or to face problems

with unsafe streets or with police and fire vehicles being unable to move about. Mr. Casazza threatened to hold International Salt responsible for streets rendered unsafe by lack of salt. He deflected any talk of price as not his responsibility.

Following this February 10 conversation between the Commissioner and the company's CEO, Mr. Hannon sent Mr. Jones a letter setting forth the City's expectation that International Salt would honor its contract and provide additional road salt at the same price. Mr. Jones also sent Mr. Casazza a letter informing him that International Salt would continue to supply salt even though it had fulfilled its obligations under the contract, and that if the parties could not agree on a price, International Salt would seek fair market value as determined by a court or through mediation. International Salt's attorney sent Mr. Hannon a letter the following day reiterating the company's position and refuting the City's contract interpretation.

On February 16, International Salt completed delivery of 75,000 tons of road salt to the City, all of which came from inventory at its facility in Charlestown, Massachusetts. The City issued three more purchase orders for salt: February 11 (25,000 tons), March 11 (3000 tons), and April 15 (50 tons). From February 16 to March 14, International Salt made an additional eighteen deliveries of salt, totaling 27,021.84 tons. For those deliveries, International Salt turned to the ocean freight spot market and paid

higher shipping rates.  The City, however, continued to pay International Salt a constant rate of $36.42 per ton for the additional shipments.

On April 15, International Salt's counsel wrote in a letter to Mr. Hannon that the company viewed the City's lack of response to its previous correspondence about pricing and its additional orders as an implicit agreement to pay fair market value, which it determined to be $56.37 per ton.  The letter concluded that the City owed International Salt an additional $1,523,221.10.  Mr. Hannon replied five days later and said that the City had been consistent in its view that the contract allowed the City to buy quantities of greater than 75,000 tons of salt at the contract price, and that Massachusetts law and the City Charter did not permit the City to pay a higher price.

International Salt filed this action in three counts: breach of contract, quantum meruit/unjust enrichment, and declaratory judgment.  The district court conducted a non-jury trial and entered judgment for the City, finding that International Salt had no viable claim of recovery.  This appeal followed.

II.

Although the City once took the position that the parties' contractual relationship continued to exist after International Salt had completed delivery of 75,000 tons of road salt, it does not make that argument on appeal.  The City does not take exception

to the district court's ruling on the first day of trial that the City's interpretation of the original contract was commercially unreasonable and that International Salt fully discharged its obligations by delivering 75,000 tons of salt to the City in compliance with the contract's terms.

The parties thus agree that International Salt must be able to demonstrate that a new contract was formed if it is to prevail on its legal claims. In this case, we cannot determine if a new contract was formed by looking solely at the parties' dealings. Instead, we must also consider Massachusetts law and the Boston City Charter, both of which set out procurement procedures and contract requirements that demand strict compliance. The district court examined those provisions and determined they were unmet, thereby leaving International Salt without contractual recourse unless it could demonstrate that the emergency provision of the Massachusetts Uniform Procurement Act applied. The district court concluded that the emergency provision did not apply.

We review de novo the district court's legal conclusions, Williams v. Poulos, 11 F.3d 271, 278 (1st Cir. 1993), and its application of the statute and charter to the facts, Servicios Comerciales Andinos, S.A. v. Gen. Elec. Del Caribe, Inc., 145 F.3d 463, 469 (1st Cir. 1998). The Massachusetts Uniform Procurement Act, Massachusetts General Laws chapter 30B, governs every contract for the procurement of supplies by the City of Boston. Mass. Gen.

-8-

Laws ch. 30B, §§ 1-2. Section 8 of the Act addresses emergency procurements.

> Whenever the time required to comply with a requirement of this chapter would endanger the health or safety of the people or their property, a procurement officer may make an emergency procurement without following that requirement. An emergency procurement shall be limited to only supplies or services necessary to meet the emergency and shall conform to the requirements of this chapter to the extent practicable under the circumstances. The procurement shall make a record of each emergency as soon after the procurement as practicable, specifying each contractor's name, the amount and the type of each contract, a listing of the supply or service provided under each contract, and the basis for determining the need for an emergency procurement.

> The procurement officer shall submit a copy of this record at the earliest possible time to the state secretary for placement in any publication established by the state secretary for the advertisement and procurements.

Mass. Gen. Laws ch. 30B, § 8. International Salt argues that the district court's findings compel the conclusion that section 8 applies. Specifically, it points to the district court's finding that it is "undisputed that salt is critical in keeping City streets safe during snow emergencies for all vehicles, and especially emergency vehicles." The district court further found that it is "beyond dispute that the City was alarmed by the prospect that its inventory of salt might be depleted, and that as a result it pressured [International Salt] to guarantee deliveries over and above the originally contemplated 75,000 tons." Finally, the district court noted that the City perceived an urgent need for

some amount of additional salt in mid-February 2005.

In spite of its sympathetic tone, the district court concluded as a matter of law that International Salt had not proved that the City had an immediate need for 25,000 tons of salt. The emergency provisions of section 8 limit procurements to only those supplies necessary to meet the emergency and excuse compliance if the time required to comply would endanger the health or safety of people or property. Given those statutory limitations and the narrow construction given by the Massachusetts courts, the district court determined that section 8's emergency provisions did not apply.

Our review of the record reveals that the district court did not err. Although the City exerted a great deal of pressure on International Salt to supply more salt – pressure which was ultimately successful – International Salt has not met its burden of proving that a true emergency existed. Public Works Commissioner Casazza and Public Works Superintendent Canavan both testified that they did not consider the City's salt supply to be at an emergency level in mid-February 2005. International Salt introduced no competing testimony. Moreover, section 8 does not excuse compliance with all of chapter 30B's requirements in the face of an emergency. It excuses only those requirements for which health and safety would be endangered if the parties took time to complete them. When discussing the City's request for more salt, the parties parried back and forth for several days, ultimately

-10-

involving Public Works Commissioner Casazza and International Salt's CEO Jones. They clearly had each other's attention and the record does not suggest that they lacked sufficient time to have negotiated a new written contract as required by section 17 of chapter 30B. Section 8 also requires the City's procurement officer to make a detailed record of an emergency procurement, including the basis for determining the need, and to submit such record to the secretary of state. No such record was created.

Similarly, the district court concluded that International Salt did not show compliance with the Boston City Charter. The Charter requires contracts involving $10,000 or more to be in writing and to have both the Mayor's approval and the City Auditor's certification of available appropriations.

> All contracts made by any department of the city of Boston . . . shall, when the amount involved is $10,000 or more, . . . be in writing; and no such contract shall be deemed to have been made or executed until the approval of the mayor of said city has been affixed thereto in writing and the auditor of said city has certified thereon that an appropriation is available therefor or has certified thereon the statute under authority of which the contract is being executed without an appropriation.

1890 Mass. Acts ch. 418, § 6, as amended by 1998 Mass. Acts ch. 262, § 1. Although the City Auditor ultimately certified that appropriated funds were available for two of the three purchase orders, the other two requirements were not met. Moreover, unlike the Uniform Procurement Act, the Charter has no emergency exception.

In Massachusetts, a party seeking to enter into a municipal contract has the responsibility of knowing the limitations on a municipality's contracting power, and such party cannot recover on a contract that does not comply. Marlborough v. Cybulski, Ohnemus & Assocs., 346 N.E.2d 716, 717 (Mass. 1976). International Salt argues that strict compliance with the City Charter is not required in all circumstances, citing Bradston Associates, LLC v. County Sheriff's Department, 892 N.E.2d 732 (Mass. 2008), and should not be required in this case because it would frustrate the purposes of the Uniform Procurement Act. However, Bradston Associates does not support International Salt's argument. The contract in Bradston Associates, which was subject to the same City Charter provisions at issue here, was a lease that was in writing, signed by the mayor, and approved by the city auditor. Through "inadvertence, negligence, or inadequate procedures," the auditor's certification showed "$0.00" as the approved and funded contract amount, when in fact sufficient funds were appropriated and available. Id. at 735 & n.5. The court refused to invalidate the contract for its lack of "a ministerial, nondiscretionary verification of existing budgetary authority." Id. at 738. It went on to contrast that function to that of the mayor, whose approval is mandatory and discretionary and not a mere ministerial act. Id. at n.9.

The lack of a contract bearing the Mayor's signature stands in the way of International Salt's ability to recover, and the

-12-

district court did not err in so holding. The district court correctly determined as a matter of law that no new contract was created between the City of Boston and International Salt that would satisfy the requirements of Chapter 30B or the City Charter, and that such failure was not excused by the emergency provisions of chapter 30B.

## III.

International Salt also asserts that the district court erred by concluding that it was not entitled to relief under a theory of equitable estoppel, even though it acknowledges that the Massachusetts Supreme Judicial Court has consistently refused to allow equitable recovery on a contract that does not comply with the material requirements of public bidding laws. E.g., Massachusetts Gen. Hosp. v. City of Revere, 434 N.E.2d 185, 187 (Mass. 1982). Nonetheless, International Salt suggests a distinction exists because no other case has dealt with the emergency provision of the Uniform Procurement Act.

The district court applied Massachusetts law and, as federal courts are bound to do, applied the interpretation formulated by the Supreme Judicial Court. See Daigle v. Maine Med. Ctr., Inc., 14 F.3d 684, 689 (1st Cir. 1994). We are not free to create an exception based on International Salt's public policy argument. The record supports International Salt's assertion that it was in a difficult position. The City was experiencing an unusually wet

winter, and its salt supplies were rapidly dwindling.  It was only February, and the City wanted to safely make it through the rest of the winter.  A new contract was out of the question because the process would take too long.  The City thus put pressure on International Salt to continue delivering salt at the old price, threatening to hold the company liable if any streets became unsafe due to lack of salt.  The City made it known that it considered its need for additional salt to be an urgent public safety issue, yet it would not invoke the emergency provisions of the Uniform Procurement Act to enter into a new contract.  Unfortunately for International Salt, it experienced an inherent risk of doing business with the City, and the fact that the City benefited from International Salt's acquiescence is now of no consequence.  See Massachusetts Gen. Hosp., 434 N.E.2d at 187 ("That the city may have benefited by the hospital's actions is irrelevant to this issue.  The statutes are controlling.").

For the foregoing reasons, we affirm the judgment of the district court.